Councilor, you've reserved five minutes of time for rebuttal, correct? Yes, Your Honor. And the appellee is dividing their time up, 12 minutes for Attorney Akers and three minutes for Attorney Nowes. Correct, Your Honor. Okay. You may proceed, sir. Good morning, Your Honors. May it please the Court, Shandong Rongxin, known as Rongxin, was subject to an administrative review concerning an anti-dumping case before the U.S. Department of Commerce, DOC. Rongxin has two broad arguments here. One is that the initiation of that review was void ab initio. It was void because Dixon Ticonderoga, the alleged petitioner, requested a review and did not meet the standards in the dumping statute. Because of that, Rongxin complained in his case brief that the review was void. Specifically, in its letter requesting the review, Dixon said that it was a U.S. importer and a producer of subject merchandise. Subject merchandise is a term of art. It applies to foreign exports under a dumping order. I think it was later stated that that was an error. They did state that. But still, it was an error. That was stated much later after the review. In the review itself... I think, is it disputed that they actually manufacture pencils in the United States? It's very much disputed, Your Honor. Yes. And that came to the fore in the first remand at the lower court. But Commerce made a finding about that, right? Based on pictures of a facility in Georgia or something? It made a decision based upon both the letter that was filed by... The letter requesting the review filed by Dixon and its rebuttal brief, both of which failed to meet the standard of the statute. Because the statute has spoken under the... They submitted invoices and other documents... That was not until the first remand. That's not in the review itself. That's in the first remand. And in those, it did submit a lot of information during that first remand. But I direct the court to Rong Xin's two rebuttals in that first remand, where two things Rong Xin provided. One, it found dozens of what it called errors in the so-called screenshots supplied by Dixon of its production in Macon, Georgia. And in all those screenshots, in those dozens of incongruities that Rong Xin found, it also found that the... It also supplied in its second response in that first remand, two documents on the internet. One was by the U.S. Department of Labor, OSHA, Occupational Safety and Health Administration. It investigated just a year earlier Dixon's facility in Macon, Georgia. It called it a distribution warehouse. And it said that all Dixon did there was basically painting logos on already finished pencils. The record shows that Dixon has plants in China and Mexico and Canada. But OSHA found no pencil production in Macon, Georgia. It only found painting of logos. Then the same month, and this is simply one year prior to our period of review, the CEO of Dixon was interviewed by a radio station. And this is on the record. Can I ask you, where is this in your blue brief? Because I have to say, I read your brief. It's not actually disputing whether they actually produced pencils. I could be wrong. So that's what... Please identify. Well, in the... Well, I cannot direct you to the exact page of... And I understand it was disputed below. I just didn't know that it was disputed before us. Well, my brief is very long, Your Honor. I don't see it offhand, but it... Maybe you could look for it while your adversaries... When you sit down, maybe while your adversary is talking, you could look for it? Sure. Okay, thank you. Is it just this one paragraph on page 36 of your brief? Dixon failed to show. The rest seems to be a variety of legal arguments that it was improper to... Right, Your Honor. Yes, I cite the OSHA press release and Dixon CEO's statement on page 36, the first full paragraph. Thank you. Is that the sum and substance of the argument? That is... Basically, they didn't meet the statute. Therefore, Commerce... There's two. That's one of them. That's the second one. I saw... I surely appreciated the other arguments. This is the only one where I wasn't... I didn't appreciate that this was a separate argument. Yes, Your Honor. It is a separate argument. The first is that Commerce had no discretion. Under the Chevron test, the first prong is met. Congress has spoken clearly to the issue of who an interested party is. Dixon did not even allege that it met that test, that it complied with the statute. And therefore, because it's crystal clear, we don't get to the second prong of the Chevron case in that Commerce has the ability to interpret, that the court should listen to its interpretation because either it's not addressed in the statute, or it's not clear, or it's ambiguous. The second... Commerce simply goes to the second prong, saying it can interpret. And it doesn't justify... It doesn't even address the first prong of the Chevron test in its opening brief. So, the CIT and Rasheen, too, they affirm Commerce's finding that Dixon was a domestic producer, withstanding to request an administrative review. Now, I understand that Dixon also was certified for CDOSA refunds. Yes, Your Honor. And to get those refunds, you have to be a domestic producer. I would... You're correct, Your Honor. The CDSOA statute is a different statute. It's not part of the dumping... BIRD disbursements? Yes, BIRD amendments. It's known as the BIRD amendment. And after Senator BIRD, who submitted it to the Senate. That's a different statute. It's enforced by the U.S. Customs and Border Protection under different regulations. It is not subject to the dumping law itself. But the CIT also considered this particular fact. It did. It did consider it. And the CIT found that the evidence supplied by Dixon outweighed the counter evidence submitted by Ron Shin. And that's why we have that second opinion by the lower court. But that, in Dixon's mind, just a year before, all they're doing is putting logos on pencils. In their mind, that might be sufficient for them to request millions of dollars under the BIRD amendment. But the point is that... Well, they were certified. They didn't just request it. They were certified to receive... Yes, and they did. They did. But in their mind, and this is why I mentioned the Brother case in detail in my brief, was to show that painting a logo on an already finished pencil under the dumping statute does not constitute substantial production in the U.S. that's required by the U.S. International Trade Commission, for example. To be a petitioner, but not to be an interested party. You still have to... Every proceeding stands on its own under the dumping law. So for each administrative review, you start from the beginning. And therefore, you have to... Because you're starting over, you have to act as if nothing happened beforehand. So sure, they were a petitioner, I don't know, 15 years earlier, maybe, like 1993 or 94. But again, they're a competitor of Ron Shin. Their... Just recently before that, their Chinese affiliate had gotten out of the dumping order. It had participated in these administrative reviews, and it had been excluded from the dumping order. So clearly, their focus had changed in the intervening years since they were a petitioner in the early 90s, to focus on their Chinese production. But they also have production in Mexico and Canada. But here's the United States government, Department of Labor, finding no pencil production. The CEO of Dixon saying, we don't produce pencils, we have 5,000 square feet. I mean, that's 50 feet by 100, okay? 5,000 square feet, that's nothing for... We all know the name Dixon Ticonderoga. We grew up with it. But clearly, it changed its focus to overseas production, and the CEO didn't even admit it. They have a screening process. I think you better get to the other issue. Okay, the second issue is, if the initiation was legitimate, then did Commerce correctly find, based upon substantial evidence on the record, that Rongxin was under control by the government of China? I refer... This is actually a very simple issue. I refer the court to the... To the articles of association that were provided by Rongxin in its Section A responses. The Commerce Department found... Do you have a joint appendix page? Yes, Your Honor. I believe it was the second supplemental... It was either the first Section A response, appendix 0156, or it was the second one, 0606. But in that... In those articles of association, Commerce relies solely on Article 7.2. Rongxin today is making public the contents of Article 7 itself. Each of those articles are basically the same as any statute in America. Each article, like every statutory provision, discusses a separate and unique concept. Who's a major shareholder? It's called Shandong International Trade Group. The percentage of ownership is over 50%? Yes, and that in turn... Is owned by SESAC, which is an entity of the Chinese government. And because of that, Commerce felt that Rongxin was owned or controlled by the Chinese government. Commerce looked at the articles of association. It didn't look at the provision regarding voting by shareholders. The whole issue here is, you have possibly... You have 11 shareholders. SITG is one of them. So 1 11th of all shareholders. It does have a majority. The board of directors is comprised of 6 people. In the POR, there were only 5. The articles of association state that SITG can only nominate one of those 6 people. It did. The other 4, and there were only 5 total, the other 4 were the next 4 largest shareholders of Rongxin, who are also employees. Can you... You're well into your rebuttal time. Can you sum up and tell us why? Okay, Commerce used Article 7.2, which regards capital contribution. It says, Perform the company's responsibility according to their shares. Commerce viewed that as saying that you can vote based upon how much you own. If you own 60%, you get 60% of the vote. So the section on capital contribution, they tried to put that into the section concerning voting. In all the articles, it doesn't talk about the voting, other than saying SITG can only nominate one, and have one person on the board. Commerce just blurs the issue. It tries to pigeonhole something that has nothing to do with voting into the voting article. Plus, any time in the articles of association it talks about how votes are cast, it always says, two-thirds of the shareholders. Nowhere in the articles does it ever talk about any kind of vote based upon how many shares you own. It's always, when it does mention it, it always says two-thirds of the shareholders. Therefore, it was not reasonable for Commerce to take something regarding capital contribution, stick it in the voting article, and assume that the vote is based upon amount of shares. Okay, we have your argument. Thank you. Attorney Akers, you have 12 minutes, correct? 12, yes, your honor. 12, yes. May it please the court, your honors. I'll address the first issue related to the interested party status, and then move to the separate rate issue. Rongshun puts forth a number of arguments as to why Commerce's determination that Dixon was an interested party is wrong. First, up here today, Rongshun argues that because Dixon used the phrase subject merchandise in its letter submitted to Commerce, that somehow precludes a finding that Dixon was, in fact, a United States producer of pencils. Rongshun never raised this argument below to Commerce. Rather, Rongshun raised the argument that there was not sufficient evidence in support of that letter.  as to whether the language subject merchandise versus domestic-like party somehow precluded a determination of interested party status, and therefore, it's waived before this court. The second thing that Rongshun argues here today is that there was alternative evidence that demonstrated that Dixon was not a United States producer of pencils. But that a party can point to evidence that detracts from Commerce's determination doesn't mean that Commerce's determination is not based on substantial evidence. Indeed, Commerce cited a list of evidence that's in the administrative record, such as work orders, production screenshots, the production facility, the disbursements, a certification by its CEO, that it was, in fact, a United States producer of pencils. The evidence dealing with OSHA I found kind of interesting because it seems to me that OSHA makes on-site visits in order to ensure that safety procedures are being followed, et cetera, standards. Can you address that? Sure, Your Honor. And this was addressed by the Department of Commerce as well. First and foremost, the OSHA was in a different period. So this was prior to the period that Dixon was making its certifications that it was a United States producer of pencils. So a different time period. And then second, this was a health visit. And so they were looking and had a different purpose for the visit. They weren't trying to assess whether a production or manufacturing facility was, in fact, in operation. And Commerce also noted in a footnote in their final results that the OSHA article, in fact, did say the word production or manufacturing in a different part of the article. And so because it's a different time period, a different purpose, and in fact, that OSHA article did, in fact, say either the word production or manufacturing, I can't quite remember. Commerce found that that did not detract from its finding. And in fact, there was stronger evidence that Commerce found, such as the work orders and production screenshots that did, in fact, show in the relevant period of time Dixon was, in fact, a United States producer of these pencils. Would it be enough for Dixon to be a United States producer if the only thing it did in the Macon plant was to put paint and lettering on already fully made pencils? That's an interesting question, Your Honor. That wasn't, in fact, addressed by Commerce because it wasn't put forth to Commerce as far as the exact procedure by which it takes to become a manufacturer versus an assembler or producer. Here, Ramshin below to Commerce simply said that there wasn't enough evidence in support of the certification that it gave to Commerce. And Commerce can, in fact, presume that a certification is sufficient and presume standing. But that's really irrelevant because once it was remanded back to Commerce, Commerce reopened the record, collected an abundance of additional evidence, in support of its determination that Dixon was, in fact, a United States producer of pencils. And what about the Byrds certification? Yeah, so that certification, we believe, demonstrates that, again, it's in support of Commerce's determination that it was, in fact, a United States producer of pencils. That's, again, an alternate certification because it's not looking at the exact issue that we have here, but it certainly is evidence in support of Commerce's determination. Is the standard for the certification under the Byrd Amendment, what is it, affected domestic producer? Correct. And it's slightly different, Your Honor. But it's certainly one piece of the evidence that Commerce relied upon. But even if we were to take that out, we still have the work orders, the production screenshots, the explanation of the production process, the certification from the CEO, and an identification of the production facility. So any one of those pieces of evidence would constitute substantial evidence upon which Commerce relied, in addition to the certification that the CEO gave. And so our argument is all of that evidence as a whole demonstrates that Commerce's determination was, in fact, supported by substantial evidence. Are you also addressing the separate duty rate issue? Yep. Let's move to that now. Sure, Your Honor. So that issue as to whether Ramshin is, in fact, entitled to a separate rate, we agree that it's a simple issue. And it really comes down to this. When a government entity, and both parties agree that Shandong International Trade Group is wholly owned by the Chinese government, SESAC, when a government entity wholly owns or has a majority ownership in a respondent exporter, there is a presumption against giving that respondent exporter a separate rate. And that's based on Commerce's practice that when a government entity has this majority ownership, either directly or indirectly, that majority ownership in and of itself means that the Chinese government exercises control or has the ability to exercise control over the company's operations, which include management. And that's one of the four elements necessary to overcome the presumption of government control. And so here Commerce made a determination based first upon the third de facto criteria, which is autonomy over management. And Commerce explained that the shareholders elect the board of directors. The board of directors, there are five of them that are at issue here. Both parties agree that SITG already has one of those. And Rongxin here argues that the articles state that SITG can have only one of those board of director seats. And that's not the case. The article states that SITG automatically gets to appoint one of those, but it doesn't speak specifically to SITG as to the other five slots. And so Commerce explained that because the shareholders elect the other five slots, the shareholders vote in accordance with the proportion of their shares. A majority vote is needed to elect a shareholder. And therefore, by virtue of SITG being the majority shareholder, it effectively has the power to place the remaining five slots. And because SITG, which again is a wholly-owned Chinese government entity, has the power to place all five of those slots in addition to the sixth one under the articles, SITG effectively controls the management. And under the Articles of Association, the management is responsible for things such as determining the export prices, negotiating contracts, determining how profits are dispersed. And so those are the other three criteria for overcoming the de facto elements. And so therefore, based on Commerce's explanation and interpretation of the articles, Rongxian cannot overcome these four elements and thus cannot show that it's independent of the Chinese government. OK, I think we have your argument. Let's hear from your colleague. Thank you. May it please the Court, Felicia Laborne Knowles with Ackerman, and I represent Dixon Ticonderoga. Your Honors, I'd like to address the issue of standing, which must be liberally construed. Rongxian would have this Court completely ignore the overwhelming record evidence in support of the fact that Dixon Ticonderoga is a manufacturer of pencils here in the United States. That record evidence includes the fact that Dixon has been a manufacturer since 1827 and during the period of review. That evidence also includes full production orders, work orders, screenshots, not just painting, Your Honor, but full production of pencils in Macon, Georgia. What did the screenshots show? The screenshots were production orders. So in Macon, Georgia, for example, to take a piece of wood to a pencil, a full pencil, there are several production steps. So in order to get from the big to the small, there are several steps. And so the screenshots showed each of those steps, basically the manufacturer of pencils, thousands of them. Is that in our appendix? It is in the... Yes, Your Honor. It is in the appendix. It is in the remand results. It's in the Court of International Trades record and it is in your appendix, Your Honor. Yes. Do you happen to have a site for us for those pages? Yes, we do. 992 through 1192. And this was addressed in Rongxing 2? This was addressed in Rongxing 1. The CIT had remanded to the Department of Commerce in Rongxing 1 when Dixon submitted work orders. But actually, again, Dixon had certified that it was an interested party on day one of the administrative review. The burden then shifts to Rongxing to put factual record evidence to rebut that presumption. Rongxing never did. Rongxing waited well a year after the administrative review was started, did all of its questionnaires, participated with commerce. It wasn't until Rongxing, until the record closed and Rongxing received a negative result that it then claimed Dixon didn't have standing. But also to take it back just a little bit further, Rongxing is trying to confuse this court to believe that the level of production, which Dixon did put on the record substantially and the CDSOA reimbursements as well, proof thereof. Rongxing is trying to confuse the court that the level of production is important. On the contrary, the administrative reviews are to determine whether exporters, such as Rongxing, are abusing the U.S. market and harming U.S. producers, not to determine the level of production of a U.S. producer. Okay. Thank you for your argument. Thank you, Your Honors. Counselor Wu, you got two minutes. Your Honor, first, the government's first legal argument is that Rongxing never brought up the issue of standing in the review itself. I direct the court's attention to Rongxing's case brief, which was filed approximately 30 days after the preliminary results. The second argument is that Dixon Ticonderoga Company, Dixon, has presented no evidence on the record, much less substantial evidence that it was a U.S. manufacturer of pencils in the United States in the period of review, POR. So Rongxing did bring it up. It did bring it up in a timely manner. Yes, it was a year after the case began, but the first legal arguments aren't required until the case brief. That's number one. Regarding who can vote for the Board of Directors, also in the case brief, in footnote one on page 11, Rongxing stated that Article 12, Article 12 regards voting. Article 12, Company sets up the Board of Directors. There are six directors, among which one director should represent SITG and recommended by SITG. Black and white, one director out of six. In this POR, there are five. That's one out of five. It states it clearly. It goes on to say, in more general terms, during his term, if SITG regards, he cannot protect its interest, it can change this director based on the related regulations. It also says all the directors should be elected by all the shareholders, but specific language is more important than general language. He can recommend and have only one director on the board. That's not controlled. All right, we thank you, sir. Thank you, Ernst. We thank the parties for their arguments. Our next case is Safe and Sick, Corporation versus SNS Holding, LLC.